A. ROLPH EVANS AND DORIS R. EVANS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2465–69.   Filed August 23, 1971.

A. Rolph Evans, pro se.
*Alan M. Stark,* for the respondent.

---

ATKINS, *Judge:* Respondent determined a deficiency in income tax against petitioners for the taxable year 1965 in the amount of $8,495.57. The issue presented for decision is the amount, if any, includable in petitioners' income on account of the receipt during 1965 from a qualified pension trust following the trust's termination of eight contracts with an insurance company. An adjustment to the allowable deduction for medical expenses is in issue only because it depends upon the proper amount of gross income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Aubrey Rolph and Doris R. Evans are husband and wife and were such during the taxable year 1965. At the time of the filing of the petition herein they resided in Westfield, N.J. They filed their joint Federal income tax return for the taxable year 1965 with the district director of internal revenue, Newark, N.J. As a matter of convenience Aubrey Rolph Evans will hereinafter be referred to as the petitioner.

Petitioner was continuously employed by W. J. Bush & Co., Inc. (hereinafter referred to as Bush), and its successor R. D. Webb & Company, Inc. (hereinafter referred to as Webb), from 1933 to August 31, 1967. As of December 31, 1945, Bush adopted an "Income Continuance Plan" (hereinafter referred to as the plan) for the benefit of its employees, under which both the employer and the employees would make contributions. A trust agreement was executed by and between Bush and the National City Bank of Cleveland on December 28, 1945, to implement the plan. The trust agreement recited that the purpose of the trust was to provide for the employees an income upon retirement. It provided that every employee who became a participant should be deemed to have assented to all the terms and provisions of the trust agreement and of each contract issued for his benefit, and be bound thereby. It was provided that the trustee should apply to such legal reserve life insurance company or companies as it might select for the issuance of such level premium contract or contracts for the benefit of the participants as would best insure the payment of the benefits to be provided for the employees. It was further provided that the contract to be applied for would, among other things, provide:

(a) for the payment of monthly retirement benefits commencing at normal retirement date with a uniform minimum guarantee of at least 60 monthly payments and, in the event of death of the retired Participant, the payment of any unpaid guaranteed monthly payments to a designated beneficiary; and

(b) for the payment of proceeds to a designated beneficiary in the event of the death of the Participant before normal retirement date; and

(c) for such Participants who are insurable at standard rates or at an extra annual premium not in excess of $10.00 per $1,000 of insurance, or 10% of the standard premiums whichever is larger, under the rules and regulations of the Issuing Insurance Company, insurance to normal retirement date in an amount not less than 100 times the monthly retirement payment.

It was further provided that all contracts issued should designate the trustee as the sole owner thereof and should be held by the trustee.

The trust created as of December 31, 1945, constituted an employees' trust as described in section 401(a) of the Internal Revenue Code of 1954 which was exempt from tax under section 501(a) of the Code from its inception and through all times pertinent herein.

Petitioner was one of the employees eligible to join the plan. He joined and participated in the plan from its inception. About April 1, 1958, Webb became the successor to Bush. In connection therewith the employees of Bush, including the petitioner, became the employees of Webb. Webb also adopted and assumed all obligations under the above plan and trust.

Under the terms of the trust agreement, the trustees purchased eight contracts from the Occidental Life Insurance Company of California (hereinafter referred to as Occidental) for the benefit of the petitioner as follows:

| Contract Nos. | Date Issued | Contract Nos. | Date Issued |
|---|---|---|---|
| 2204220 | Dec. 31, 1945 | 1729570 | Dec. 31, 1952 |
| 2204133 | Dec. 31, 1945 | 1740703 | Dec. 31, 1954 |
| 2205809 | Dec. 31, 1946 | 1744308 | Dec. 31, 1955 |
| 1723241 | Dec. 31, 1951 | 1751517 | Dec. 31, 1957 |

The terms of all the contracts were substantially the same, except as to the amounts of money involved.

Each contract provided that it might be assigned by the owner at any time, but that no assignment was binding on Occidental until it was filed with it.

Each of the contracts provided that Occidental would pay the petitioner a retirement income of a certain amount per month when he attained the age of 65, such income to be payable for 60 months certain and for as long thereafter as petitioner lived. The contract also provided for certain elections. At the time of retirement the petitioner could elect any one of four optional monthly incomes in lieu of the above monthly retirement income. One option was to receive a reduced monthly income for 120 months certain and thereafter during his lifetime. Another option was to receive a reduced monthly income for 180 months certain and thereafter during his lifetime. Another option was to receive a joint and last survivor monthly income payable so long as either the petitioner or a named beneficiary should live. It

was also provided that the petitioner might elect to receive a reduced monthly retirement income at any time not more than 15 years before the normal retirement date. He also had the right to elect to receive a postponed retirement income to commence not later than 5 years after the normal retirement date. Each contract provided that if petitioner should die while receiving monthly income payments, all monthly payments remaining for the period certain, or their commuted value, should be made to the beneficiary named by petitioner.

Each contract provided that in the event the petitioner died before attaining age 65 Occidental would pay either the face amount of the contract (which amounted to 100 times the monthly retirement income) or the cash surrender value of the contract, whichever was greater, to the beneficiary designated by the petitioner.

Each of the contracts provided that if any premium remained in default after a grace period of 31 days the contract would cease, subject to certain nonforfeiture provisions. Under such nonforfeiture provisions the petitioner had available the following options:

1. Cash. To Surrender This Policy To The Company For The Net Cash Value.— Which is the cash value as shown in Column 1 of the table less any indebtedness to the Company hereon.

2. Paid-Up Endowment Insurance. To Continue This Policy As Non-Participating Paid-Up Endowment Insurance—The amount payable in event of death of the Insured before the Normal Retirement Date shall be either the amount indicated in Column 2 of the table [amount of paid-up insurance payable at death before normal retirement date] or the cash value of the paid-up endowment insurance at date of death, whichever is the greater amount. The amount payable at the Normal Retirement Date shall be either the cash payment indicated in Column 3 or the Retirement Income indicated in Column 4, as may be then elected; provided, however, that if the amount of the Retirement Income is less than Ten Dollars per month, the cash payment must be taken.

Automatic Non-Forfeiture Option—In event of default in payment of premiums, Option 2 shall become operative as of the date of default except that Option 1 may be substituted therefor if requested within three months following such default.

\*      \*      \*      \*      \*      \*,      \*

Computation on Non-Forefeiture Values—\* \* \* The amount of paid-up insurance under Option 2 shall be such as the net cash value will purchase at the net single premium rate for the attained age of the Insured at date of default based on the reserve basis. The paid-up insurance may be surrendered within thirty days after any policy anniversary for a cash value which shall be equal to the full reserve of such paid-up insurance on such anniversary according to the reserve basis.

It was provided that the contract could be reinstated within 5 years of default upon satisfactory evidence of insurability and payment of all overdue premiums with interest.

Webb terminated the plan and trust as of December 31, 1964. The trustee of the trust had paid all premiums for the contracts held in trust up to and including December 31, 1963. However, the trustee did not pay the premiums due on the eight contracts on December 31, 1964. Nor did petitioner pay the premiums on their due dates.

On February 16, 1965, the trustee of the trust delivered to petitioner the eight contracts then held for his benefit. The dates that the trustee executed the assignment forms for the contracts, the dates that these forms were filed at the home office of Occidental, and the dates that the petitioner received the forms are as follows:

| Contract Nos. | Executed by trustee | Filed with Occidental | Received by petitioner |
|---|---|---|---|
| 2204220 | 2/ 1/65 | 2/15/65 | 2/18/65 |
| 2204133 | 2/ 1/65 | 2/15/65 | 2/18/65 |
| 2205809 | 2/ 1/65 | 2/15/65 | 2/18/65 |
| 1723241 | 2/ 1/65 | 2/15/65 | 2/18/65 |
| 1729570 | 2/25/65 | 3/18/65 | 3/31/65 |
| 1740703 | 2/25/65 | 3/18/65 | 3/31/65 |
| 1744308 | 2/25/65 | 3/18/65 | 3/31/65 |
| 1751517 | 3/24/65 | 3/31/65 | 4/ 5/65 |

At the time the eight contracts were distributed to petitioner, the face amounts, the cash surrender values, and the paid-up insurance payable at death before normal retirement date were as follows:

| Contract Nos. | Face amount | Cash value | Paid-up insurance for death before retirement |
|---|---|---|---|
| 2204220 | $1,691 | $1,981.85 | $1,981.85 |
| 2204133 | 15,000 | 17,580.00 | 17,580.00 |
| 2205809 | 6,037 | 7,014.99 | 7,014.99 |
| 1723241 | 1,840 | 2,020.32 | 2,020.32 |
| 1729570 | 6,026 | 6,508.08 | 6,508.08 |
| 1740703 | 1,083 | 1,123.07 | 1,123.07 |
| 1744308 | 1,000 | 1,008.00 | 1,008.00 |
| 1751517 | 1,670 | 1,558.11 | 1,670.00 |
| | | 38,794.42 | |

Petitioner's total adjusted cost basis in the eight contracts was $5,341.01.

After the plan terminated the petitioner engaged in a number of discussions by telephone and through correspondence with Occidental concerning his rights under the eight contracts. He wanted to avoid any lump-sum receipt of the cash values of the contracts. He also sought to take all steps necessary to avoid being taxed on the cash values of the contracts once they had been distributed to him. On March 29, 1965, petitioner wrote a letter to Occidental indicating that he wanted the contracts continued under Option 2 of the contracts. The contracts as distributed to petitioner did not contain nontrans-

ferable endorsements. Such endorsements were added on petitioner's request dated March 31, 1966, and were effective as of that date.

On October 30, 1965, petitioner received a Form 1099 for the taxable year 1965 from the trustee of the trust. The form indicated the distribution by the trustee to petitioner during 1965 of the eight contracts with a cash value of $38,794.42 and cash in the amount of $469.79.

On this return for 1965, petitioner did not report any taxable income on account of his receipt of the eight contracts. On the return he indicated that the plan had been terminated and that he had received the eight contracts. He also stated:

I am not accepting any benefits whatever from these policies, but expect to collect reduced annuity commencing at maturity date. I am paying no more premiums.

The policies have been made non-transferable.

In the notice of deficiency, respondent increased petitioner's gross income by the amount of $33,453.11. The respondent stated:

It is determined that during the taxable year 1965 you received distributions of retirement income policies in the amount of $33,453.11 which were not reported on your income tax return. Those distributions are taxable to you as ordinary income, and accordingly, your taxable income is increased $33,453.11. See Section 402(a) of the Internal Revenue Code of 1954.

OPINION

The issue presented for decision in this case is whether any amount is includable in petitioner's income as a result of the distribution to him in 1965 of eight contracts with an insurance company by a qualified pension trust upon the trust's termination.

Under section 402(a) of the Internal Revenue Code of 1954 [1] an employer's contributions to an exempt employees' trust are not taxed to the employee when made, but taxation is deferred until such amounts are actually distributed or made available to him, and taxation is governed by the rules relating to annuities under section 72.

Section 402(a) does not specifically deal with the distribution of contracts purchased by an exempt trust as part of a qualified plan. However, section 1.402(a)-1(a)(2) of the Income Tax Regulations sets forth the following rules concerning the taxability of distributions by an exempt trust of an annuity or a retirement income, endowment, or other life insurance contract:

If a trust described in section 401(a) and exempt under section 501(a) purchases an annuity contract for an employee and distributes it to the employee

---

[1] Sec. 402(a) provides in part as follows:

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

(1) GENERAL RULE.—Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by an employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities). * * *

in a year for which the trust is exempt, the contract containing a cash surrender value which may be available to an employee by surrendering the contract, such cash surrender value will not be considered income to the employee unless and until the contract is surrendered. For the rule as to nontransferability of annuity contracts issued after 1962, see paragraph (b)(2) of § 1.401-9. If, however, the contract distributed by such exempt trust is a retirement income, endowment, or other life insurance contract and is distributed after October 26, 1956, the entire cash value of such contract at the time of distribution must be included in the distributee's income in accordance with the provisions of section 402(a), except to the extent that, within 60 days after the distribution of such contract, all or any portion of such value is irrevocably converted into a contract under which no part of any proceeds payable on death at any time would be excludable under section 101(a) (relating to life insurance proceeds). If the contract distributed by such trust is a transferable annuity contract issued after 1962, or a retirement income, endowment, or other life insurance contract which is distributed after 1962 (whether or not transferable), then notwithstanding the preceding sentence the entire cash value of the contract is includible in the distributee's gross income, unless within such 60 days such contract is also made nontransferable.

The respondent contends that the eight contracts distributed by the trustee to petitioner in 1965 were retirement income policies and that the cash surrender values thereof are includable in petitioner's gross income because petitioner failed within 60 days to convert the contracts irrevocably into annuity contracts and to make them nontransferable. He points out that these contracts had provided petitioner with life insurance protection for many years and contends that at the time of distribution they represented paid-up endowment insurance. He further points out that under section 101(a)[2] the proceeds of life insurance paid by reason of the death of the insured are excluded from the recipient's gross income and argues that these contracts would be considered life insurance contracts within the meaning of section 101(a), citing section 1.101-1(a) of the Income Tax Regulations.[3]

---

[2] Sec. 101 of the Code provides in part as follows:

SEC. 101. CERTAIN DEATH BENEFITS.

(a) PROCEEDS OF LIFE INSURANCE CONTRACTS PAYABLE BY REASON OF DEATH.—

(1) GENERAL RULE.—Except as otherwise provided in paragraph (2) and in subsection (d), gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured.

[3] Sec. 1.101-1(a) of the Income Tax Regulations provides in part as follows:

Sec. 1.101-1. Exclusion from gross income of proceeds of life insurance contracts payable by reason of death.—(a)(1) In general. Section 101(a)(1) states the general rule that the proceeds of life insurance policies, if paid by reason of the death of the insured, are excluded from the gross income of the recipient. Death benefit payments having the characteristics of life insurance proceeds payable by reason of death under contracts, such as workmen's compensation insurance contracts, endowment contracts, or accident and health insurance contracts, are covered by this provision. * * *

*      *      *      *      *      *      *

(2) Cross references. For rules governing the taxability of insurance proceeds constituting benefits payable on the death of an employee—

(i) Under pension, profit-sharing, or stock bonus plans described in section 401(a) and exempt from tax under section 501(a), or under annuity plans described in section 403(a), see section 72(m)(3) and paragraph (c) of § 1.72-16; * * *

The respondent argues that the purpose of section 402, namely, to merely defer income taxation of employers' contributions, can be abused if an exempt trust distributes life insurance contracts, because of the possibility of the beneficiary's receiving the proceeds, if paid by reason of death, as tax-exempt income under section 101(a). It is his position, therefore, that if an exempt trust distributes contracts which have a life insurance risk in existence when executed, and the distributee fails to irrevocably convert these contracts into annuity contracts outside of the ambit of section 101(a), the distributee realizes taxable income to the extent of the contracts' cash surrender value at the time of distribution. He further states that there must be an act on the part of the distributee which, in itself, is actually an irrevocable conversion from a retirement income or endowment contract to an annuity contract which in no way contains an element of life insurance protection to assure the Government that the beneficiary will not claim the benefits of section 101(a) upon the death of the distributee. It is his position that the mere elimination of the life insurance risk when the cash surrender value exceeds the face value is not sufficient to constitute the irrevocable conversion contemplated by the regulations, referring to the published position taken in Rev. Rul. 66-322, 1966-2 C.B. 123.

In the alternative, the respondent argues that if the Court should decide that the retirement income policies were automatically converted into annuities when their cash surrender value equaled or exceeded the face value then they should be considered as annuities issued when such conversion took place; that the policies whose cash surrender value first exceeded the face value after December 31, 1962, would be considered annuities issued after 1962; and that petitioner would be taxable on the cash surrender value of these since he did not make them nontransferable within 60 days after distribution.

After a careful consideration of the facts of this case and the applicable law, we have concluded that respondent's contentions cannot be sustained as to the seven of the eight contracts whose cash surrender values equaled or exceeded their face amounts at the time of their distribution.

The stated objective of petitioner's employer in establishing the trust was to provide an income upon retirement for those employees who became participants under the plan. The trustee was instructed to apply to life insurance companies for the purchase of contracts that would provide the participants with the necessary income upon retirement, that would provide for payment of the proceeds of such contracts to beneficiaries should the participants die before retirement and that would provide the participants with life insurance protection until retirement.

The contracts purchased for petitioner's benefit provided for the payment of a certain retirement income per month when he attained the age of 65 which was payable for at least 60 months and as long thereafter as he lived. The contracts also provided that if petitioner died before attaining age 65, the beneficiary designated by petitioner should receive the face amount (which equaled 100 times the monthly retirement income) or the current cash surrender value of the contracts, whichever was greater. If the contracts were continued in force by the payment of premiums until petitioner reached the retirement age of 65, he would have an election either to receive their cash surrender value or to begin receiving one of the four optional monthly incomes available under the contracts.

The trust which had control of the contracts did not pay the premiums that were due as of December 31, 1964, and the trust was terminated as of that date. At that time seven of the eight contracts had cash surrender values equaling or exceeding their face amounts. On February 16, 1965, after the grace period for payment of premiums had lapsed, the contracts were distributed to petitioner. In this circumstance, the contracts provided petitioner with a number of different rights. He could elect to surrender the contracts for their cash value, or to reinstate the contracts and continue to pay the premiums until age 65 when he would receive the benefits provided for, or to begin receiving a reduced monthly income immediately. If petitioner did nothing within 3 months of the premium default the contracts provided that at age 65 he would be entitled to a reduced monthly income or the cash surrender value, or if he died before age 65, his beneficiary would receive the amount of paid-up insurance available at the time of distribution or the cash surrender value at date of death, whichever was greater. At the time of distribution, the amount of paid-up insurance and the cash surrender value were equal in the case of seven of the eight contracts.

After analyzing all the terms of the contracts, it appears to us that the contracts when issued consisted of both an annuity element and a life insurance protection element. It also appears from the nature of the plan and the contracts themselves that the primary feature of the contracts is the annuity benefit and that the life insurance protection is incidental thereto. Support for this analysis is found in the regulations and rulings under section 401 dealing with the qualification of pension plans. Section 1.401–1(b)(1)(i) of the regulations [4]

---

[4] Sec. 1.401–1(b)(1)(i) of the Income Tax Regulations provides in part as follows:

(b) *General rules.*—(1)(i) A pension plan within the meaning of section 401(a) is a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years, usually for life, after retirement. Retirement benefits generally are measured by, and based on, such factors as years of service and compensation received by the employees. * * * A pension plan may provide for the payment of a pension due to disability and may also provide for the payment of incidental death benefits through insurance or otherwise. * * *

provides that the primary purpose of a qualified plan must be to provide retirement benefits and that life insurance protection can be provided only if it is incidental to the primary purpose. The respondent has ruled that life insurance protection under a qualified pension plan is incidental where the insurance benefit is no greater than 100 times the monthly annuity. See, e.g., Rev. Rul. 65–178, 1965–2 C.B. 106. Under the contracts purchased on petitioner's behalf the life insurance protection was no greater than 100 times the monthly retirement income.

The life insurance protection provided by the contracts is equal to the excess of the face amount over the cash surrender value of the contracts. As the cash surrender value of the contracts increases with the payment of each premium, the amount of insurance protection decreases. Thus, the insurance protection provided by the contracts is a form of decreasing term insurance. See *Jeffrey* v. *United States*, an unreported case (D.N.J., 11 A.F.T.R. 2d 1401, 1402, 63–1 U.S.T.C. par. 9475). When the cash surrender value of the contracts equals or exceeds the face amount, the life insurance protection provided by the contracts ceases.

Once the life insurance protection disappears, the contracts are pure annuity contracts. And there is no provision under the contracts that would allow for the conversion of any part of the contracts into further life insurance protection. When the eight contracts were distributed to petitioner, all current and potential life insurance protection had disappeared from seven of the eight contracts whose cash surrender value equaled or exceeded the face amount. In choosing any alternative available under these seven contracts which would continue them in existence, the amount payable on petitioner's death would never exceed their cash surrender value.

Thus, seven of the contracts distributed to petitioner were at that time pure annuity contracts. They were not at that time retirement income, endowment, or other life insurance contracts as to which section 1.402(a)–1(a)(2) of the regulations would require some act of conversion on the part of the petitioner in order to entitle the petitioner to the favorable tax treatment accorded the receipt of an annuity contract. We think that Rev. Rul. 66–322, which would require a contrary conclusion under the present circumstances, is an erroneous interpretation of the regulations. Further, we think the respondent has advanced no good reason why such contracts should be treated as having been issued at any time other than the time of their original issuance. The annuity feature was part of the contracts from their inception, and it was under the very terms of the contracts that such annuity feature was the only operative provision when the insurance feature disappeared. Accordingly, we do not consider that any of them were issued after Decem-

ber 31, 1962, and hence none of them is subject to the requirement of the regulations that it be made nontransferable within 60 days after its distribution.

The analysis of this Court in *Raymond J. Moore*, 45 B.T.A. 1073, acq. 1944 C.B. 20, although made under provisions of prior law, supports the conclusions reached herein. In *Moore*, we had before us a pension plan involving contracts which we characterized as "combination life insurance and annuity contracts." After holding that the plan qualified under existing law, we went on to reject respondent's contention that the entire premium paid constituted a current distribution to the participants under the plan and hence taxable income to them. In so holding, we stated in part as follows:

> Respondent's treatment of the entire premium in each case as income to the beneficiary of the policy when paid is based upon the assumption that these policies are in fact life insurance contracts until the insured reaches the age of 65, whereupon they are converted into annuity contracts. We think that assumption is unsound. All of the contracts were in effect from the payment of the first premium; by their terms they provided for annuity payments at the age of 65, and for this agreement the major portion of the premium is paid. There are two distinct features in the policies. One is a death benefit, and the other, a retirement endowment. The respective portions of the lump sum premium paid for the death benefit and the annuity are subject to computation. We think that the annuity feature of the contracts was not life insurance, but an annuity contract in form of an endowment from its issuance. * * *

It may be added that we think the provisions of section 20.2039–1(d) of the Estate Tax Regulations, while not directly applicable here, lend some support to our conclusions hereinabove.[5]

We have also concluded that the potential abuse of section 402 referred to by the respondent does not exist as to the seven contracts whose cash surrender value equaled or exceeded their face amount at the time of distribution. At that time the life insurance feature of these contracts disappeared and the amount that any beneficiary would

---

[5] Sec. 20.2039–1(d) of the Estate Tax Regulations provides in part as follows:
A combination annuity contract and life insurance policy on the decedent's life (e.g., a "retirement income" policy with death benefits) which matured during the decedent's lifetime so that there was no longer an insurance element under the contract at the time of the decedent's death is subject to the provisions of section 2039(a) and (b). On the other hand, the treatment of a combination annuity contract and life insurance policy on the decedent's life which did not mature during the decedent's lifetime depends upon the nature of the contract at the time of the decedent's death. The nature of the contract is generally determined by the relation of the reserve value of the policy to the value of the death benefit at the time of the decedent's death. If the decedent dies before the reserve value equals the death benefit, there is still an insurance element under the contract. The contract is therefore considered, for estate tax purposes, to be an insurance policy subject to the provisions of section 2042. However, if the decedent dies after the reserve value equals the death benefit, there is no longer an insurance element under the contract. The contract is therefore considered to be a contract for an annuity or other payment subject to the provisions of section 2039(a) and (b) or some other section of part III of subchapter A of chapter 11. * * *

receive would be the cash surrender value. As a matter of principle, we do not see how any beneficiary could successfully claim that such amounts are exempt from income tax as the proceeds of life insurance under section 101(a). See *Jeffrey* v. *United States, supra.*

Moreover, we think that the provisions of section 72(m)(3) of the Code and the regulations thereunder lend substantial support to the view we have taken. Such section provides as follows:

(3) LIFE INSURANCE CONTRACTS.—
    (A) This paragraph shall apply to any life insurance contract—

   *        *        *        *        *        *        *

    (ii) purchased by a trust described in section 401(a) which is exempt from tax under section 501(a) if the proceeds of such contract are payable directly or indirectly to a participant in such trust or to a beneficiary of such participant.
    (B) Any contribution to * * * a trust described in subparagraph (A)(ii) which is allowed as a deduction under section 404, and any income of a trust described in subparagraphs (A)(ii), which is determined in accordance with regulations prescribed by the Secretary or his delegate to have been applied to purchase the life insurance protection under a contract described in subparagraph (A), is includible in the gross income of the participant for the taxable year when so applied.
    (C) In the case of the death of an individual insured under a contract described in subparagraph (A), an amount equal to the cash surrender value of the contract immediately before the death of the insured shall be treated as a payment under such plan or a distribution by such trust, and the excess of the amount payable by reason of the death of the insured over such cash surrender value shall not be includible in gross income under this section and shall be treated as provided in section 101.

Section 1.72–16 of the Income Tax Regulations states that for purposes of that section a life insurance contract is "a retirement income, an endowment, or other contract providing life insurance protection." It further states in part as follows:

(c) *Treatment of proceeds of life insurance and annuity contracts.* (1) If under a qualified pension, annuity, or profit-sharing plan, there is purchased either—
    (i) A life insurance contract described in paragraph (b)(1) of this section, and the employee either paid the cost of the insurance or was taxable on the cost of the insurance under paragraph (b) of this section, or
    (ii) An annuity contract,
the amounts payable under any such contract by reason of the death of the employee are taxable under the rules of subparagraph (2) of this paragraph, except in the case of a joint and survivor annuity.
    (2) (i) In the case of any annuity contract, the death benefit is the accumulation of the premiums (plus earnings thereon) which is intended to fund pension or other deferred benefits under a pension, annuity, or profit-sharing plan. Such death benefits are not in the nature of life insurance and are not excludable from gross income under section 101(a).

(ii) In the case of a life insurance contract under which there is a reserve accumulation which is intended to fund pension or other deferred benefits under a pension, annuity, or profit-sharing plan, such reserve accumulation constitutes the source of the cash value of the contract and approximates the amount of such cash value. The portion of the proceeds paid upon the death of the insured employee which is equal to the cash value immediately before death is not excludable from gross income under section 101(a). The remaining portion, if any, of the proceeds paid to the beneficiary by reason of the death of the insured employee—that is, the amount in excess of the cash value—constitutes current insurance protection and is excludable under section 101(a).

(iii) The death benefit under an annuity contract, or the portion of the death proceeds under a life insurance contract which is equal to the cash value of the contract immediately before death, constitutes a distribution under the plan consisting in whole or in part of deferred compensation and is taxable to the beneficiary in accordance with section 72(m)(3) and the provisions of this paragraph, except to the extent that the limited exclusion from income provided in section 101(b) is applicable.

While section 72(m)(3) apparently contemplates a situation where the trust continues to own the contracts, we see no reason why the same result with regard to the applicability of section 101(a) should not follow where the contracts have been distributed to the participant, as in the present case.

In view of the foregoing, we hold that no amount is includable in petitioner's income as a result of the distribution to him in 1965 of the seven contracts whose cash surrender values equaled or exceeded their face amounts.

We have reached a different conclusion as to the one contract whose cash surrender value at the time of distribution was less than its face amount. Such contract still contained life insurance protection as well as the annuity benefit, and constituted a retirement income policy, within the provisions or section 1.402(a)–1 (a) (2) of the regulations. Petitioner did not, within 60 days after its distribution to him, make such policy nontransferable, as required by the regulations. Petitioner has not questioned the validity of the regulations, but argues only that since all eight contracts are part of a single qualified plan they should be considered as one contract, and that since at the time of distribution their aggregate cash surrender value exceeded their aggregate face amount, all eight should be treated as a single annuity contract. He refers to section 1.72–(2) (a) (3) (i) and (ii) of the Income Tax Regulations, which provides that for purposes of applying the provisions of section 72 with regard to annuity payments, amounts paid by a qualified trust which are financed by a number of contracts are to be treated as having been paid under a single contract. We fail to see how such regulation has application here. It does not deal with the distribution of the contracts themselves. We cannot

ignore the fact that the petitioner actually received eight separate contracts, and it seems obvious that the nature of each must be separately determined for purposes of section 402(a).[6]

In view of the foregoing, we hold that the cash surrender value of the contract whose face amount exceeded its cash surrender value at the time of distribution to petitioner is includable in petitioner's gross income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[6] It may be further noted that acceptance of the petitioner's view that all contracts should be treated as one contract would not lead to the tax treatment he seeks. Petitioner refers to the fact that the aggregate cash surrender value of the eight contracts exceeds the aggregate face amount at the time of distribution, and argues that this proves that there is no life insurance protection present. But this does not follow. In seven of the eight contracts, the amount payable on death is not the face amount but the cash surrender value since the latter is the larger amount in each instance. The total amount payable on death is the total of these cash surrender values plus the face amount of the eighth contract since in this contract the face amount still exceeds the cash surrender value. Thus, the total amount payable on death would be greater than the total cash surrender value, indicating the presence of continued life insurance protection to the extent of the excess. Thus, by considering all eight contracts as one contract, such one contract would be a retirement income contract since it still included some life insurance protection, and the aggregate cash surrender value would be includable in petitioner's income under the regulations.